JUSTICE RICE,
dissenting.
¶106 Today the Court retreats from its clear declaration of the *539 fundamental constitutional rights of parents. In exchange, the Court adopts an equitable, case-by-case inquiry to determine if a third party should be granted a parental interest of a child that must be balanced against a natural parent’s rights. The Court’s decision will open a Pandora’s Box of potential attacks upon the right of fit and capable parents to raise their own children. I dissent from this weakening of parental constitutional rights.

A Parent’s Constitutional Rights

¶107 We have previously recognized “the constitutional rights of a natural parent to parent his or her child,” explaining that this right requires “careful protection” and is ‘hot merely a matter of legislative grace, but is constitutionally required.” In re A.R.A., 277 Mont. 66, 70, 919 P.2d 388, 391 (1996). This Court has explained that there are few invasions “into the privacy of the individual that are more extreme than that of depriving a natural parent of the custody of his children.” In re Guardianship of Doney, 174 Mont. 282, 285, 570 P.2d 575, 577 (1977). Consequently, we have protected parents against claims adverse to these constitutional rights by repeatedly holding that “a natural parent cannot be denied custody of his or her child absent termination of that person’s parental rights for abuse or neglect...” In re Parenting of J.N.P, 2001 MT 120, ¶ 25, 305 Mont. 351, 27 P.3d 953 (emphasis added). We have erected high legal barriers to protect parents from claims of third parties, holding that a ‘finding of abuse, neglect, or dependency is the jurisdictional prerequisite for any court-ordered transfer of custody from a natural parent to a third party.” J.N.P., ¶ 18 (citation omitted, emphasis added). Even when considering a minimally invasive claimAhe mere visitation of a child by the child’s grandparents-we have rejected on constitutional grounds the failure to recognize the wishes of a fit parent. Polasek v. Omura, 2006 MT 103, ¶¶ 15-17, 332 Mont. 157, 136 P.3d 519 (TP]arents have a fundamental constitutional right to make decisions concerning the care, custody, and control of their children.” (citations and quotations omitted)).
¶108 However, the Court denies to Maniaci the constitutional protections promised to her in our previous holdings by removing the ‘jurisdictional prerequisite,” which has protected parents against the claims of third parties, and thereby opens wide the door to such claims-not only against Maniaci, but potentially against all parents. Now, even parents who are fit and capable, like Maniaci, are potentially subject to the claims of third parties for rights to their children.
*540 ¶109 In reaching this conclusion, the Court misstates or misunderstands our previous constitutional holdings and offers what I believe are faulty grounds to distinguish those cases, for the apparent purpose of diminishing the reach of the constitutional rights previously declared for parents. About our pre-1999 decisions, the Court offers that the “pre-1999 statutes made termination of parental rights, based upon dependency, abuse, or neglect, the only option available to the Court before it could award a nonparent a custodial interest,” citing A.R.A. in support. Opinion, ¶ 56 (emphasis added). To the contrary, it was not the statutes that limited third party claims against parents in those cases, but the constitutional rights of parents. A.R.A. held that a pre-1999 statute was unconstitutional for the very reason that it permitted a third party to be awarded a custodial right before the parents’ rights had been terminated. A.R.A., 277 Mont. at 72, 919 P.2d at 392 (‘[Section] 40-4-221, MCA, is unconstitutional to the extent that it allows the granting of a §-221 petition prior to the termination of the natural parent’s constitutional rights.”). As we stated when striking down a subsequent statute in J.N.P., “A.R.A. [was] based on constitutional considerations.” J.N.P., ¶20 (emphasis added). Contrary to the Court’s analysis, it was not the pre-1999 statutes that limited the claims of third parties, but the Montana Constitution.
¶110 The Court similarly displaces the holding of our 2001 decision of J.N.P., stating that the third party claimants there “could not rely upon the nonparental statutes in seeking custody of J.N.P., however, in light of their failure to comply with the statutory pre-requisites of first establishing a child-parent relationship through a petition filed under § 40-4-211, MCA.” Opinion, ¶ 63. However, the third party claimants in J.N.P. did file a petition under §40-4-211, MCA. J.N.P., ¶ 22. Their claim was rejected, not for failing to satisfy this “statutory pre-requisite” (similar to the statutory pre-requisite in this case), but because the parents’ constitutional rights were superior to the statute: “a natural parent cannot be denied custody of his or her child absent termination of that person’s parental rights for abuse or neglect ....” J.N.P., ¶ 25. Thus, we struck down §40-4-211 because it suffered ‘from the same constitutional infirmity as the statute we invalidated in the case of In re A.R.A.” J.N.P., ¶ 21.
¶ 111 The Court dismisses the constitutional basis for our holding in Polasek on the ground that the grandparent visitation statute at issue there was “different” because here the Legislature has explicitly provided that it is ‘hot necessary” for a natural parent to be found unfit before awarding a parental interest to a third party. Opinion, ¶ *541 69. In Polasek, the statute permitted mere grandparent visitation claims, and yet we held that the statute’s failure to consider the wishes of a fit parent was unconstitutional. Polasek, ¶¶ 15, 20. Here, as we consider a third party’s claim to aparental interest of a child, the Court bows to the Legislature’s determination that parental unfitness need not be shown. The Court’s reasoning is a non sequitur and its retreat from constitutional principle has permitted the Legislature to legislate Maniaci’s constitutional rights out of existence.[1]
¶112 Although the Court goes to great lengths to dismiss the constitutional basis for our decisions, these decisions clearly stand for the proposition that “a natural parent cannot be denied custody of his or her child absent termination of that person’s parental rights ....” J.N.P., ¶ 25 (emphasis added). In my view, the Court’s effort to distinguish our previous holdings is flawed and does not diminish the constitutional rights of parents we have clearly declared.

The Constitutionality of §40-4-228, MCA

¶113 We have previously struck down two similar statutes as unconstitutional for failing to require termination of a parent’s interest before invading a parent’s constitutional rights. A.R.A., 277 Mont. at 72, 919 P.2d at 392 (stating the statute was “unconstitutional to the extent that it allows the granting of a § - 221 petition prior to the termination of the natural parent’s constitutional rights” by establishing abuse, neglect, or dependency); J.N.P., ¶ 21 (The prior version of § 40-4-211(4)(b) “suffers from the same constitutional infirmity as the statute we invalidated in the case of In re A.R.A.”).
¶114 The Legislature has enacted §40-4-228, MCA, which states, in pertinent part:
(2) A court may award a parental interest to a person other *542 than a natural parent when it is shown by clear and convincing evidence that;
(a) the natural parent has engaged in conduct that is contrary to the child-parent relationship; and
(b) the nonparent has established with the child a child-parent relationship, as defined in 40-4-211, and it is in the best interests of the child to continue that relationship.
* * *
(5) It is not necessary for the court to find a natural parent unfit before awarding a parental interest to a third party under this section.
¶115 First, this statute implicates a fundamental right. ‘The liberty interest at issue in this case-the interest of parents in the care, custody, and control of their children-is perhaps the oldest of the fundamental liberty interests recognized by this Court.” Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Thus, this statute is subject to strict scrutiny review. Polasek, ¶ 15 (We apply “close scrutiny” to “any infringement on a person’s right to parent a child.”).
¶116 This statute, like the prior statutes we have invalidated, invades the constitutionally protected natural parent-child relationship without first requiring termination of the parent’s interests. This statute thus likewise fails to provide the protection of parental rights that is “constitutionally required,” A.R.A., 277 Mont. at 70, 919 P.2d at 391 (citing Stanley v. Ill., 405 U.S. 645, 92 S. Ct. 1208 (1972)), and “[tjherefore, the result must necessarily be the same.” J.N.P., ¶ 23.
¶117 The reasoning employed by the Court to uphold this statute is flawed for several reasons. First, having dispensed with our precedent declaring the constitutional rights of parents, discussed above, the Court takes up the issue of the statute’s validity in a constitutional vacuum, as if there is no guiding precedent. To fill this vacuum, the Court looks to the Legislature’s expression of what the Constitution requires, deferring to the Legislature’s constitutional interpretation. Opinion, ¶¶ 57, 70. However, it is the purview of the courts to determine the existence and nature of constitutional rights, not the Legislature’s. The Court thus fails to do its duty. In re Lacey, 239 Mont. 321, 326, 780 P.2d 186, 189 (1989) (‘TT]he judiciary has authority over the interpretation of the Constitution ....”).
¶118 Secondly, the Court offers no rationale explaining how a third party’s relationship with a child can overcome, constitutionally, a fit *543 and capable parent’s right to raise the child. It offers no analysis about how the Legislature’s elimination of the fitness requirement can withstand strict scrutiny. The Court simply declares that the Legislature’s will trumps this Court’s declaration of constitutional rights.
¶119 The Court defends the statute’s constitutionality by offering that “Montana’s nonparental statutes avoid constitutional infirmity under the Troxel standard through the twin thresholds of consideration of the wishes of the natural parent and the need to first establish a child-parent relationship.” Opinion, ¶ 71. However, Troxel did not reach this question. The U.S. Supreme Court explicitly declined to reach the question of whether the U.S. Constitution requires that a parent allow harm to the child before the parent’s rights can be invaded. Troxel, 530 U.S. at 73, 120 S. Ct. at 2064 (TW]e do not consider the primary constitutional question passed on by the Washington Supreme Court-whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context.”). Thus, the pronouncements of this Court, not the U.S. Supreme Court, provide the constitutional guidance for this issue. And, as discussed above, we have repeatedly held that the Constitution requires that a parent’s interests must be terminated before the State can invade a natural parent’s constitutional rights.
¶120 Finally, the Court vaguely references children’s rights in defending the statute. The Court first states that Maniaci argues that her children ‘have no constitutionally protected rights, absent a showing of abuse, neglect, or dependency.” Opinion, ¶ 54. That is incorrect. Maniaci does not argue that her children have no rights but, rather, that those rights are precisely as stated by this Court and the U.S. Supreme Court. The Court then offers that the statute is valid because it balances “the constitutionally protected rights of both the parents and children in determining the best interests of the child,” Opinion, ¶ 70, but fails to state what the rights of either party are. I have explained above the parental constitutional rights declared by this Court. Similarly, this Court has explained that the constitutionally protected right of a child is “to be with his or her natural parent.” A.R.A., 277 Mont. at 71, 919 P.2d at 391 (citing Stanley, 405 U.S. at 652, 92 S. Ct. at 1213); see also J.N.P., ¶ 17. This is the companion right to the right of the parent to raise his or her own *544 child. This constitutional right of the child weighs in favor of the parent’s rights.
¶121 For the reasons above stated, I would strike down the statute.

The Proper Interpretation of §40-4-228, MCA

“A court is never going to take a parent’s right away without a significant period of just absolute disregard and abandonment [of] their children.”

Sponsor, 1999 Statutory Amendments

¶122 Even assuming for argument purposes that §40-4-228, MCA, is valid and constitutional, a proper reading of the statute and a review of its legislative history reveals that it was not intended to provide the relief granted to Kulstad by the District Court.
¶123 It should not be necessary to repeat that Ti]n the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.” Section 1-2-101, MCA. However, here the District Court did that very thing-it inserted new language into the statute. The Court affirms the error.
¶124 Section 40-4-228(2), MCA, provides that a court may award a parental interest to a nonparent when “(a) the natural parent has engaged in conduct that is contrary to the child-parent relationship; and (b) the nonparent has established with the child a child-parent relationship ....’’Thus, a plain reading of this provision establishes two requirements, one on the part of the natural parent (conduct contrary to the child-parent relationship), and one on the part of the third party (establishment of a child-parent relationship).
¶125 However, in applying provision 228(2)(a) to Maniaci, the District Court concluded that the provision was satisfied because Maniaci engaged in conduct contrary to “an exclusive child-parent relationship” with her children. Unable to hold from the evidence that Maniaci had acted in any way “contrary to the child-parent relationship,” as the statute actually reads, the District Court was forced to add language to the statute-imposing a judicially-created “exclusive” requirement-in order to conclude that the provision had been satisfied.
¶126 The District Court’s conclusion of law should be reversed because “exclusive” is not in the statute, and it is beyond the proper role of the District Court to insert that language. The Court affirms, discussing at length the evidence that Maniaci did not exclude all others from a child-parent relationship with the children. The Court states that ‘Maniaci repeatedly and continually acted contrary to her *545 child-parent relationship,” but the only supporting facts it cites are those showing that Maniaci acted contrary to an exclusive child-parent relationship. Opinion, ¶ 78. Further, the Court fails to explain why non-exclusivity is inherently contrary to Maniaci’s child-parent relationship with her children. Critically, the Court’s reasoning here demonstrates that, from now on, a parent who does not exclusively parent her child opens the door to a third party challenge to her parental rights.
¶127 Further illustrating the error in the Court’s interpretation is the resulting collapse of the two separate statutory requirements into one. If Maniaci’s action of allowing Kulstad to establish a parent-child relationship is conduct contrary to Maniaci’s relationship with the children, then subsection 228(2)(a) and (2)(b) cease to be separate requirements. Satisfaction of 2(b) automatically satisfies 2(a). Thus, the only question is whether Kulstad has established a parent-child relationship. Applying the statute’s plain language, I would not require that Maniaci’s conduct satisfy an “exclusive”parent-child relationship.
¶128 Further, the legislative history of the 1999 Amendments illustrates that the District Court’s order is not what the Legislature intended. In introducing SB 486, Senator Halligan explained that §40-4-228, MCA, dealt with a “narrowly defined area,” which he explained was “where biological parents are not doing their job.” He emphasized in closing remarks that the statute was “very narrow.” He further explained that the provision allowing another person to stand ‘in loco parentis” to a child, (subsection 228(4)), is for those situations where a “parent has not conducted themselves in a way that’s appropriate.” Examples in the hearing included cases where “parents are gone for a long time” — Tour or five years”-with ‘ho child support, no contact, no anything.” During this discussion, the sponsor was asked what the standards would be for determining if a parent had acted inappropriately, and the sponsor included this in his answer:
A court is never going to take a parent’s right away without a significant period of just absolute disregard and abandonment for their children.[2]
¶129 The evidence here utterly fails to demonstrate that Maniaci was ‘hot doing [her] job,” had failed to “conductG [herself] in a way that’s appropriate,”‘has been gone for a long time”from her children, left her children with ‘ho child support, no contact, no anything” for *546 four or five years, or engaged for “a significant period of just absolute disregard and abandonment” of her children. Yet, these are the kind of situations the Legislature intended to address by the 1999 Amendments. The Court’s failure to apply the statute as plainly written results in a grave interpretational error.

The Consequences of the Court’s Decision

¶130 From its emphasis on the facts of this case, it is apparent that the Court has found Kulstad’s case to be factually compelling, as did the District Court, and, thus, has ruled in her favor. But the Court has not acknowledged the significance of the most fundamental facts of this case: Maniaci is a parent, and Kulstad is not. This distinction involves much more than semantics. The Court fails to recognize the clearly differing legal rights arising out of this critical distinction between the parties, and that failure leads to consequences that go far beyond the resolution of this particular child custody dispute.
¶131 To hold for Kulstad, the Court has, remarkably, withdrawn or narrowed previously recognized constitutional rights of fit parents. It has removed the ‘jurisdictional prerequisite” of termination of the natural parents’ rights, upholding a statute that allows a third party to establish a parental interest of a child even though that child already has a fit parent. While the initial consequence of this decision falls upon the litigants in this case, consequences of geometric proportion will fall in the future upon many fit parents. The Court’s withdrawing of constitutional protection against third party parenting claims will permit many claims to proceed, which formerly would have been legally barred. Fit and capable parents will now be forced to defend against such third parties’ claims. To be sure, many of these claims will be factually weaker than Kulstad’s claim, and will no doubt fail. Nonetheless, parents will be forced to defend against them. The U.S. Supreme Court has recognized that “the burden of litigating a domestic relations proceeding can itself be so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child’s welfare becomes implicated.” Troxel, 530 U.S. at 75, 120 S. Ct. at 2065 (citation and quotations omitted).[3]
¶ 132 Lest this be deemed as merely a “sky is falling” concern, it need only be noted that other cases raising these very issues are already pending before this Court. In In re Parenting of J.D.B., DA 08-0505, a *547 mother, whose fitness is uncontested, is defending against a third party parenting claim to her children by her mother-in-law, who has cared for the children. Citing the precedent relied upon by this dissent, the mother argues in her briefing that “[w]here third parties seek custody, it has long been the law of Montana that the right of the natural parent prevails until a showing of a forfeiture of this right.... This forfeiture can only result where the parent’s conduct does not meet the minimum standards of the child abuse, neglect and dependency statutes.” This is the argument made by this dissent and that any lawyer studying our precedent would make. See also In re Parenting of L.F.A., DA 08-0456 (A natural mother argues that a third party “may not simply acquire parental interests in the children absent significant deference to [a mother’s] constitutional rights.”).
¶133 There will be many more such cases. A legacy of this decision is the legion of parents who will be forced to litigate in order to protect the rights that the Constitution once guaranteed to them. A single parent must now consider whether a new romantic relationship will jeopardize the right to parent her or his children by way of a future third party parenting claim. Other like situations abound. As argued by the Appellant in L.F.A.:
Many parents will at times leave their children in the care of a non-parental partner when they are unable to watch the child. More well-off families might have a nanny who cares for a child or set of children from their birth. Not infrequently children will be closer to these caregivers than even their own parents. Is every boyfriend, girlfriend, relative, grandparent or professional caregiver to be entitled to parenting rights just because they have cared for the child?
¶134 There will be further consequences as well. This case may well be reported as a legal victory for the rights of same-sex couples. Because both sides have stated that the parties’ gender is not a determinative issue in this case, neither the Court nor this dissent has discussed it. Regardless, the implications of the decision go far beyond the gender of the particular parties at issue here. There are parameters in neither the statute nor this decision that limit the kind or number of parties and relationships that will be now subject to parenting claims. Before this decision, protection of parental constitutional rights, which required termination of a parent’s rights before granting a parental interest to a third party, necessarily, by biology and the adoption laws, limited the number of parents a child could have. However, those inherent limits have now been removed by *548 the Court.[4] Consequently, what if three or four adult partners develop a “parent-child relationship” with a child? Multiple-party clusters raising children, or polyamorous ‘families,” are the next wave in societal relationship experimentation. See Jessica Bennett, Only You. And You. And You.: Polvamorv-Relationshins with Multiple. Mutually Consenting Partners-Has a Coming-out Party . Newsweek (July 29, 2009) (available online at http://www.newsweek.eom/id/209164/page/l); Susan D. James, Polvamorv: When One Spouse Isn’t Enough. ABC News (June 18, 2009) (available online at http://abcnews.go.com/Health/US/Story?id=7870884&page=l). While it may be at least a little while before a trial court concludes that such claims are in a child’s best interest, claims to multiple parenting interests arising out of such communal living arrangements are now legally possible, making them inevitable.
¶135 The abandonment of constitutional principle for the expediency of today’s decision will have long, far-reaching and negative impacts. I dissent and would reverse the District Court.

 The Court also states that, in our prior cases, third parties sought to “terminate the parental rights” of the natural parent in order to secure custody of a child ‘to the exclusion” of the natural parent. Opinion, ¶ 56. Without expressly saying so, the Court appears to imply that the subject statute is less invasive because it does not contemplate termination of the natural parents’ rights and the complete taking of custody of a child away from a natural parent. However, first, the third parties in our prior cases did not seek the termination of parents’ interests, but rather they sought to obtain custody without such termination. That is why we invalidated the statutes. A.R.A., 277 Mont. at 72, 919 P.2d at 392. Secondly, §40-4-228, MCA, does permit a court to grant a parental interest in a third party and transfer custody of a child to that party. Indeed, steps in that direction have occurred here. In its post-judgment orders, the District Court has ordered professional care to be given to Maniaci’s children without notice to or involvement by Maniaci. It has restricted Maniaci’s access to the children and to their records. Lastly, even if shared custody is ordered, the loss of custodial rights to a child is nonetheless extremely invasive and a violation of a fit natural parent’s constitutional rights. As we have held, we apply strict scrutiny to “any infringement” upon a person’s right to parent his or her child. Polasek, ¶ 15.

 See minutes and audio recording, 1999 House Judiciary Committee hearing, SB 486.

 Of course, Maniaci has now lost her right to make such “certain basic determinations” for her children as a result of this litigation.

 Kulstad was prohibited from adopting the children under the adoption laws, but the Court has not held that this prohibition barred Kulstad’s claim. That argument was made by an amicus curiae.